Sheriel SEXCIUS, et al., Plaintiffs,

v.

DISTRICT OF COLUMBIA,
et al., Defendants.

Civ. A. No. 88–2104 (RCL).

United States District Court,
District of Columbia.

Dec. 13, 1993.

Francine K. Weiss, Kalijarvi & Chuzi, P.C., Washington, DC, for plaintiffs.

Eugene Adams, Asst. Corp. Counsel, Washington, DC, for defendants.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This case comes before this court on plaintiffs' motion for an award of attorney's fees and costs under 42 U.S.C. § 1988, the Civil Rights Attorney's Fee Awards Act of 1976. Having considered the extensive memoranda and evidence of both parties, this court shall grant plaintiffs' motion, awarding plaintiffs $247,809.87 in attorney's fees and costs. A separate order shall issue this date.

## I. BACKGROUND

The case underlying this attorney's fee litigation is an action alleging the violation of First and Fourteenth Amendment rights of two District of Columbia schoolteachers, Sheriel Sexcius and William Edmead, who had spoken out regarding certain educational practices. Attorneys Francine K. Weiss and Edith Barnett represented the teachers,

working together in this case as they had long done on other cases.[1] Ms. Weiss was lead counsel and the point of contact between plaintiffs and counsel and witnesses. (She and Ms. Barnett were aided by three law students, who helped organize documents and research.)

Ms. Weiss and Ms. Barnett won for their clients a permanent injunction forbidding Woodson High School Principal Lucile Christian, Director of the Public School Certification and Accreditation Branch Mary B. Hendrick, the superintendent of schools, the District of Columbia, and the mayor from infringing on plaintiffs' constitutional rights and from retaliating against plaintiffs in the workplace again for speaking out on their educational views. In an order accompanying the resolution of the merits of plaintiffs' claim, this court determined that plaintiffs are entitled to reasonable attorney's fees and costs. *See Sexcius v. District of Columbia,* No. 88–2104, slip op. at 52 (D.D.C. Oct. 15, 1992). The issue now before this court is what constitutes reasonable attorney's fees and costs in this case.

## II. ATTORNEY'S FEES

"The initial estimate of a reasonable attorney's fee"—the so-called lodestar fee—"is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate." *Blum v. Stenson,* 465 U.S. 886, 888, 104 S.Ct. 1541, 1543, 79 L.Ed.2d 891 (1984) (citations omitted).[2] To determine the lodestar, this court will determine, in turn, the reasonable hourly rate and the reasonable number of hours billed by counsel.

### A. Counsel

#### 1. Reasonable Hourly Rate

■ Plaintiffs claim compensation at a billing rate of $260 per hour, which is (they claim) the prevailing market rate for lawyers with their legal experience. Defendants argue that the appropriate rate is no more than $100 per hour, the rate that plaintiffs paid their counsel throughout this litigation under a retainer agreement. Because plaintiffs' counsel charged plaintiffs this low $100 rate out of public interest motives, plaintiffs are entitled to collect the prevailing market rate, not merely the rate they actually charged plaintiffs.

#### a. Counsel Charged Reduced Rates in the Public Interest

■ Plaintiffs' counsel have a tradition of charging their less wealthy clients below-market rates when their cases are important to the public interest. In the present case, for example, because plaintiffs were public school teachers—in the words of their counsel, "not wealthy people"—their counsel agreed to charge them only $100 per hour, a "rate[ ] they could afford." (Defendants have conceded that this $100 rate is below the market rate.[3]) Counsel charged them this reduced rate in order to take plaintiffs' case, which posed important constitutional questions and affected the educational interests of the city's public school students. (Barnett Decl. (Reply) at ¶ 6; Weiss Decl. (Reply) at ¶ 7.)

This is not an atypical case for plaintiffs' counsel. They have a tradition of representing the constitutional and statutory rights of individual employees and employee groups, including labor unions. Because counsel earn their living from their practice, they cannot afford to represent their clients for free. (Weiss Decl. (Reply) at ¶ 8; Barnett Decl. (Reply) at ¶ 5.) Instead, they represent their worthy but not wealthy clients at below-market rates. Lawyers who make this kind of noble compromise may recover pre-

---

**1.** Ms. Barnett left private practice in late 1991 to become an Administrative Law Judge at the United States Department of Labor.

**2.** This lodestar fee may also be adjusted when necessary in a particular case. *See Blum,* 465 U.S. at 888, 104 S.Ct. at 1543. In the present case, however, plaintiffs do not seek any lodestar adjustments.

**3.** According to defendants' evidence, the prevailing market rates of lawyers with more than ten years of litigation experience who handle civil rights and employment discrimination cases in this community were $125 to $150 per hour in 1992. (Zielinski Decl., *Covington v. District of Columbia,* 839 F.Supp. 894 (D.D.C.1993), Opp'n Mem. Ex. B.)

vailing market rates for their work. *See Save Our Cumberland Mountains v. Hodel,* 857 F.2d 1516, 1520 (D.C.Cir.1988) (*en banc*) (*SOCM*). Because plaintiffs have shown that their counsel charge below-market rates out of public-spirited motives, plaintiffs are entitled to recover the prevailing market rate for their counsels' services.

### b. Prevailing Market Rate

■ Although plaintiffs are clearly entitled to a fee award calculated at the rates prevailing in the relevant legal market,[4] the parties disagree as to which market of legal services is the "relevant market" in this case.

Plaintiffs argue that the matrices and other evidence they have produced, charting the rates charged by lawyers across the District of Columbia for complicated federal litigation, establish the prevailing market rate. This matrix-based evidence would award counsel $260 per hour.

Defendants challenge plaintiffs' matrix-based evidence as too broad to be useful. Plaintiffs' matrices and other evidence survey rates that District of Columbia lawyers earn from commercial clients for performing "general legal services," rates far higher than those the market awards for plaintiffs' civil rights work. (Defs.' Opp'n, at 11.) Ms. Weiss might earn $260 per hour from a commercial client for her general legal services; for her civil rights work for plaintiffs, by contrast, the market would provide her no more than $125–$150 per hour,[5] defendants argue.

■ Defendants' position may be plausible. As discussed in *Covington v. District of Columbia,* No. 87–2658, —— F.Supp. ——, (D.D.C. Dec. 13, 1993), no District of Columbia federal court appears to have spoken squarely on the issue of sub-markets, but the legislative history of § 1988[6] and subsequent Supreme Court[7] and District of Columbia circuit[8] caselaw construing attorney's fee statutes make clear that in resolving any

---

**4.** *See Missouri v. Jenkins,* 491 U.S. 274, 286, 109 S.Ct. 2463, 2470, 105 L.Ed.2d 229 (1989). Plaintiffs' counsels' established billing rates—if counsel have such—are not directly relevant to the determination of the fee award. *See SOCM,* 857 F.2d at 1524.

For this reason, defendants' reliance on *Kattan v. District of Columbia,* 995 F.2d 274 (D.C.Cir. 1993), is misplaced. In *Kattan,* the parties believed that under the statute in question (20 U.S.C. § 1415(e)(4)(C), the fee-shifting provision of the Handicapped Children's Protection Act), "an attorney's usual billing rate is presumptively the reasonable rate, provided that this rate is 'in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" *Kattan,* 995 F.2d at 278 (citations omitted). This is a restatement of the *Laffey* test for fixing fee awards. *See Laffey v. Northwest Airlines, Inc.,* 746 F.2d 4, 24–25 (D.C.Cir.1984).

The *en banc SOCM* court overruled this *Laffey* test with respect to counsel like Ms. Weiss and Ms. Barnett. Where (as here) counsel charge below-market rates out of public interest motives, the "reasonable hourly rate" is properly calculated not according to the hourly rates that counsel have actually charged in similar cases, but according to "rates that reflect the prevailing community rate for similar legal services." *SOCM,* 857 F.2d at 1517. Counsels' usual billing rate is thus not directly relevant.

**5.** This range is based on defendants' evidence. Defendants have submitted seven instances in which lawyers who performed civil rights work

for plaintiffs had established billing rates between $125 and $150 per hour.

**6.** Senate Report No. 94–1011 (1976) U.S.Code Cong. & Admin.News 1976, 5908, indicates that in enacting § 1988, Congress intended attorney fee awards to reflect the prevailing rates that counsel could have earned in the legal market. *See Blum,* 465 U.S. at 893, 104 S.Ct. at 1546 (citing S.Rep. No. 94–1011, p. 6 (1976)).

**7.** In calculating attorney's fees under § 1988, the Supreme Court has "consistently looked to the marketplace as [its] guide to what is 'reasonable.'" *Jenkins,* 491 U.S. at 286, 109 S.Ct. at 2470.

**8.** The District of Columbia Circuit has long recognized that under fee-shifting statutes, attorneys should be compensated "for the market value of services rendered." *Copeland v. Marshall,* 641 F.2d 880, 894 (D.C.Cir.1980) (*en banc*).

Further, some District of Columbia caselaw appears to support defendants' sub-market theory more specifically. The *Copeland* court held that the reasonable hourly rate to be awarded under fee-shifting statutes is the rate "prevailing in the community *for similar work.*" *Copeland,* 641 F.2d at 892 (emphasis added). *See also SOCM,* 857 F.2d at 1521 (finding congressional intent to award "rates commensurate with prevailing community standards of attorneys of like expertise *doing the same sort of work in the same area.*") (emphasis added).

particular attorney's fee question under § 1988 (including this sub-market question), courts must aim to award attorney's fees that mirror what counsel would earn in the market. If the market would provide different sub-markets[9] of lawyers different hourly rates, courts properly aiming to mirror the market would award fees accordingly, granting lawyers in each sub-market the fees that their particular services command in the marketplace.

Unfortunately, the resolution of the parties' debate in this case is no more satisfying than the resolution of the District of Columbia's identical debate with the plaintiffs in the *Covington* case. Defendants have produced exactly the same evidence in both cases. In that case, as in this one, defen-

dants' evidence is not sufficient to persuade this court that the prevailing rate in the sub-market of plaintiffs' lawyers handling civil rights, employment, and discrimination cases is—as defendants claim—lower than the rate prevailing in the broader market of complicated federal litigation.[10] Because defendants have not carried their evidentiary burden, this court cannot rule for defendants. Because this court cannot rule for defendants, for today plaintiffs' theory that the relevant market should be very broadly defined still stands.[11] Because plaintiffs have met their evidentiary burden under that theory—and because defendants' factual rebuttal of plaintiffs' evidence has been ineffectual—plaintiffs shall be awarded the prevailing market rates for their services in the broadly

---

9. Defendants have not convinced this court that lawyers handling civil rights, employment, or discrimination cases for plaintiffs constitute a sub-market of their own. Perhaps a better defined sub-market would include lawyers handling civil rights, employment, or discrimination cases for private defendants, as well.

10. Defendants' sole affidavit, sworn by Michael E. Zielinski, Assistant Deputy Corporation Counsel, Civil Division (Opp'n Mem. Ex. B), offers insufficient evidence of this contention.

To challenge plaintiffs' counsels' rates, Zielinski's affidavit cites only seven instances in which lawyers with 10–20 years of experience charged $125 to $150 per hour in representing plaintiffs in civil rights, employment, or discrimination matters. Standing alone, these seven instances are insufficient to demonstrate that $125–$150 per hour is the prevailing rate across the District of Columbia in this sub-market. *See Nat'l Ass'n of Concerned Veterans v. Sec. of Defense*, 675 F.2d 1319, 1325 (D.C.Cir.1982) (per curiam) (parties opposing fee awards have burden of rebutting evidence favoring high fees with "equally specific countervailing evidence.... tending to show that a lower rate would be appropriate.") *See also id.*, 675 F.2d at 1337–38 (Tamm, J., concurring). These seven instances look suspiciously representative of only the lower end of the sub-market. Just because some lawyers are willing to take some civil rights, employment, or discrimination cases at low-end rates of $125 to $150 per hour, does not establish $125 to $150 per hour as the prevailing market rate for the entire sub-market. Defendants have failed to proffer evidence of the high end, as well as the low end, of the range of rates commanded in their proposed sub-market.

11. Ruling on the merits of defendants' theory will have to wait for another, better litigated case in which the party opposing fees produces a more thorough evidentiary record. The *Coving-*

*ton* decision's guidance as to what might constitute a better documented case bears repeating:

"In future cases, parties opposing fee awards might come forward with more persuasive evidence. A *statistically reliable, well-documented, and extensive survey of the rates clients pay for a certain sub-market of legal services* would be powerfully persuasive. Such a survey would collect the rates of a statistically significant number of lawyers or firms within a legal sub-market, convincing the court that the survey's scope is broad enough to reflect the market faithfully. Such a survey would be sufficiently documented with supporting affidavits, assuring the court of the accuracy of the survey's data. Lastly, such a survey would encompass both the high rates that large, prestigious law firms in the area command for their work in the submarket and the lower rates commanded by others for their work in the sub-market. (Ideally, the survey would also indicate what fraction of clients pay which rates within the sub-market's rate spectrum. That is, the survey would state what fraction of the sub-market's clients take their cases to high-priced firms, what fraction to low-priced firms, and what fraction to firms priced in the middle. This would help the court determine whether any given rate is typical or aberrant.)

Parties seeking fees for legal services performed in a lucrative sub-market—in the antitrust sub-market, for example—might proffer a statistically reliable, well-documented, and extensive survey of that sub-market's rates in order to show that in the marketplace, their counsels' work commands high fees. Parties opposing excessive fee awards for work performed in a less lucrative sub-market might proffer a statistically reliable, well-documented, and extensive survey of that sub-market's rates to establish that in the marketplace, counsel would have commanded only a modest fee." *Covington v. District of Columbia*, 839 F.Supp. 894 (D.D.C.1993).

defined market of complicated federal litigation. This court now turns to the determination of those rates.

In performing the difficult task of calculating the prevailing market rates for attorney's fees, this court by necessity relies upon the parties' evidence of the prevailing market rates. *See Nat. Ass'n of Concerned Vets. v. Sec. of Defense*, 675 F.2d 1319, 1323–24 (D.C.Cir.1982) (per curiam) (noting that attorney's fee cases impose a "difficult burden" on a district court and "correspondingly heavy" evidentiary burdens on fee applicants). Defendants' blunderbuss criticisms of plaintiffs' matrices—as representing only a small percentage of the District of Columbia's Bar, as omitting the "lower end of the market" of legal services, and as failing to reflect the recent slowdown in the growth of rates—may have merit, but standing alone these criticisms are insufficient to undermine plaintiffs' evidence. *See Concerned Veterans*, 675 F.2d at 1337–38 (Tamm, J., concurring). Because defendants have produced little helpful countervailing evidence and because plaintiffs' evidence—though not entirely satisfying—is more persuasive, this court is forced to rely solely upon plaintiffs' evidence.

Plaintiffs' chief evidence is a pair of court-approved matrices. The first of these matrices—the *Laffey* matrix—is an updated fee matrix that has been relied upon, at least in part, by six District of Columbia district judges [12] and that has received a degree of approval from the Court of Appeals for the District of Columbia Circuit.[13] The second matrix—developed by the U.S. Attorney's Office for the District of Columbia for use in negotiating settlements [14]—extrapolates from the 1981–82 rates set by the *Laffey* court in 1982 [15] by adding the Consumer Price Index increase for the Washington, D.C., metropolitan area to the prior year's rate, and rounding upwards if the sum is within $3 of the next $5 multiple. (*See Covington*, Appendix B, Methodology Note.) The rate for 1991–92, the last fee year charted by the U.S. Attorney's office's matrix, is $250 per hour. (*See Covington*, Appendix B.) Plaintiffs follow the U.S. Attorney's Office's extrapolation method to calculate a 1992–93 hourly rate of $260.[16] Relying upon plaintiffs' inadequately rebutted (but not unrebuttable) evidence, this court finds that the prevailing market rate for 1993 is $260 per hour.

### c. Retainer Provision

Defendants' final argument against plaintiffs' requested $260 hourly rate stems from defendants' interpretation of a provision of the retainer agreement between plaintiffs and their counsel. Under the retainer agreement, plaintiffs paid their counsel only $100 per hour for their time on this case, and plaintiffs and their counsel agreed that any portion of a fee award that exceeds "the amount of fees actually incurred by the clients" shall be remitted to the clients. Believing this provision to award plaintiffs any

---

12. *See Fischbach v. District of Columbia*, No. 87–646 (D.D.C. Jan. 4, 1993) (Penn, J.); *Robles v. United States*, No. 84–3635 (D.D.C. Jan. 10, 1992) (Flannery, J.); *Trout v. Ball*, 705 F.Supp. 705, 709 n. 10 (D.D.C.1989) (Harold Greene, J.); *Palmer v. Barry*, 704 F.Supp. 296, 298 (D.D.C. 1989) (Oberdorfer, J.); *Thompson v. Barrett*, 599 F.Supp. 806, 814 (D.D.C.1984) (Richey, J.); *Laffey v. Northwest Airlines, Inc.*, 572 F.Supp. 354, 371–75 (D.D.C.1983) (Robinson, J.), *aff'd*, 746 F.2d 4 (1984), *rev'd on other grounds*, SOCM.

13. *See SOCM*, 857 F.2d at 1525 (commending use of *Laffey* matrix). *See also Goos v. National Association of Realtors*, 997 F.2d 1565, 1568 (D.C.Cir.1993) (*dicta* implying that the *Laffey* matrix is "the schedule (or matrix) of prevailing community rates [that has been] adopted in this circuit.").

The matrix is set forth in *Covington v. District of Columbia*, 839 F.Supp. 894 (D.D.C.1993), Appendix A.

14. This matrix is set forth in *Covington*, Appendix B.

15. *See Laffey*, 572 F.Supp. at 371.

16. Plaintiffs multiply $250 per hour by the 3.4 percent rate of the Metropolitan Area Consumer Price Index, add that to the matrix's 1991–92 rate of $250 per hour, and round up to the nearest $5 increment. (Pls.' Application, at 3.)

Defendants claim that legal rates are not rising in the current market, and they challenge plaintiffs' annual escalation of rates. However, defendants have not submitted enough persuasive evidence for this court to rule in its favor on this point. Defendants have submitted salary charts from the *Legal Times* which show that although many firms did not raise their rates every year between 1989 and 1992, some firms increased their rates by more than $25 per hour per year.

portion of the award that exceeds the $100 hourly rate that plaintiffs paid their counsel under the agreement, defendants argue that awarding any rate higher than that $100 rate would grant plaintiffs an impermissible windfall and violate the bar of *Kay v. Ehrler*, 499 U.S. 432, 111 S.Ct. 1435, 113 L.Ed.2d 486 (1991), against awarding fees to *pro se* plaintiffs.

Defendants have misconstrued the retainer agreement. It does not remit to plaintiffs any fraction of this fee award that exceeds the amount plaintiffs have already paid their counsel, as defendants claim. Rather, it simply prevents counsel from receiving double payment for their services. The agreement guarantees that counsel will not collect both the court's award of fees for their work and plaintiffs' payment of fees to them for that same work. Under the agreement, once counsel have in hand both the court's fee award and the fees paid to them by plaintiffs, counsel must subtract from that combined amount the "fees actually incurred by the clients"—*i.e.,* the hours counsel worked for plaintiffs multiplied by the reasonable hourly rate—and remit the difference to plaintiffs. In short, the retainer agreement ensures that counsel receive only what they have earned (or more precisely, what they would have earned if they had charged market rates).

This is the understanding of this provision shared by plaintiffs [17] and their counsel.[18] Nothing in the provision prevents this court from awarding plaintiffs a rate higher than $100 per hour.

### 2. *Reasonable Number of Hours Expended*

■ Plaintiffs request compensation for the hours they expended on this case, including time expended litigating this fee petition. (A reasonable fee for time reasonably expended on fee applications is recoverable. *See, e.g., Sierra Club v. E.P.A.,* 769 F.2d 796,

811 (D.C.Cir.1985); *Environmental Defense Fund v. E.P.A.,* 672 F.2d 42, 62 (D.C.Cir. 1982).) Defendants argue that these claimed hours should be cut by five percent, mainly because plaintiffs did not support with specific examples their assertions that they used sound billing judgment.

Yet plaintiffs' counsel did use good billing judgment, well-documented for this court's review. (Weiss Decl. (Application) at ¶ 12; Barnett Decl. (Application) at ¶ 1.) For example, Ms. Weiss reduced her bills by about twenty hours in October 1988 when she felt that her daughter's hospitalization distracted her and made her less efficient. Ms. Weiss also carefully billed the 17.05 hours she spent doing paralegal work—drafting and updating a chronology of events, summarizing documents, organizing documents and preparing exhibits—at paralegal rates, not at her own higher rates. (Weiss Decl. (Application) at ¶ 12.[19]) Defendants charge that time plaintiffs' counsel billed for meetings between Ms. Weiss and Ms. Barnett is duplicative, yet at these meetings counsel tried to coordinate plaintiffs' litigation strategies for efficiency. In any event, Ms. Weiss has not billed for at least twenty hours of the time she spent conferring with Barnett. Lastly, in plaintiffs' application counsel deleted all non-billed and non-billable matters. For example, counsel also did not charge for the two hours spent conferring with another attorney who was also litigating against the District of Columbia. Nor did Ms. Weiss charge for about twelve hours she spent calling plaintiffs, witnesses, or Ms. Barnett from home.

In short, plaintiffs' counsel used sound billing judgment and documented their billing decisions well enough for this court to confirm that. Plaintiffs may recover fees for all of their time.

### B. *Law Clerks*

■ For the services of their counsels' law clerks and for the time that Ms. Weiss spent

---

17. Sexcius Decl. (Reply) at ¶ 1; Edmead Decl. (Reply) at ¶ 1.

18. Barnett Decl. (Reply) at ¶ 2.

19. Defendants contend that Ms. Weiss should also have billed at paralegal rates her time spent summarizing depositions. Although Ms. Weiss did bill only at paralegal rates for her time spent

summarizing documents generally, the work of reviewing and summarizing the deposition testimony of important witnesses is different, especially as counsel is a small firm that cannot delegate such tasks to junior lawyers. Ms. Weiss deserves to be compensated at her higher rates for this work.

doing law-clerk-type chores, plaintiffs claim $5,228.00, for 65.35 hours at $80 per hour. (Reply Ex. 1.)

The work of paralegals and law clerks is compensable, as part of a "reasonable attorney's fee," according to the practice prevailing the legal community. *See Jenkins*, 491 U.S. at 285–87, 109 S.Ct. at 2470–71. The prevailing practice in the District of Columbia is for lawyers to bill clients for the work of their law clerks at the prevailing market rate.[20] Plaintiffs have submitted reasonably persuasive, effectively unrebutted, evidence that the current prevailing market rate for law clerks in the District of Columbia is $80 per hour. (The hourly rate plaintiffs claim— $80 per hour—is the rate that the U.S. Attorney's matrix would award for the year 1992–93 if the matrix were extended to this year according to the matrix's own extrapolation method.[21]) Plaintiffs have documented the time of their law students and of Ms. Weiss in sufficient detail, listing services performed by date and time. (Reply Ex. 6). Thus, plaintiffs may recover their requested fees for their law clerks.

### C.  Current Rates

Plaintiffs request a fee award calculated at current, not historical, rates. Because awarding current rates may mitigate the hardship of the seven years' delay between the first billing in this case and final payment,[22] plaintiffs shall be compensated at current market rates.

### III.  COSTS

Plaintiffs seek an assortment of out-of-pocket costs incurred in the course of this litigation, and the question before this court is which of these costs Congress has authorized this court to shift to defendants. In § 1988, Congress has authorized the shifting of only those out-of-pocket costs that are customary elements of an "attorney's fee"; in 28 U.S.C. § 1920, Congress has authorized the shifting of other out-of-pocket costs. This court may shift only those costs that fit into one of these two categories.[23]

The former category—encompassing all customary elements of an "attorney's fee"— includes all those out-of-pocket expenses that have "traditionally been included in calculations of the lawyers' hourly rates," including those out-of-pocket costs that many lawyers have recently removed from their hourly rates and now bill separately to the client.[24]

Other statutes, notably 28 U.S.C. § 1920, determine which items of expense are includ-

---

20.  *See, e.g., In re Donovan*, 877 F.2d 982, 993, 997 (D.C.Cir.1989) (per curiam); *In re Olson*, 884 F.2d 1415, 1426 (D.C.Cir.1989).

21.  Defendants make the same objections to this $80 per hour matrix-based rate that they made to plaintiffs' counsel's $260 per hour matrix-based rate. Yet defendants have submitted only two instances in which District of Columbia lawyers requested less than $80 per hour for the work of paralegals or law clerks, insufficient evidence that the prevailing market rate for the work of paralegals or law clerks across the District of Columbia is less than $80 per hour.

22.  Plaintiffs have been incurring fees since late 1987. No interim settlement of attorney's fees or costs provided plaintiffs with more timely compensation.

23.  In *West Virginia University Hospitals, Inc. v. Casey*, 499 U.S. 83, 86, 111 S.Ct. 1138, 1141, 113 L.Ed.2d 68 (1991), the Supreme Court used this two-part analysis to determine whether § 1988 permitted fees for experts' nontestimonial servic-

es to be shifted to a losing party. First, the Court found that "[n]one of the categories of expense listed in § 1920 can reasonably be read to include" fees for experts' nontestimonial services. *Id.* 499 U.S. at 86, 111 S.Ct. at 1141. Second, the Court determined that "the phrase 'attorney's fees' [does not] embrac[e] fees for experts' services." *Id.* at 97, 111 S.Ct. at 1146. Because fees for experts' nontestimonial services fell into neither category, the Court concluded that courts lacked power to shift those fees.

24.  *West Virginia*, 499 U.S. at 98, 111 S.Ct. at 1147. *See also Northcross v. Board of Ed. of Memphis City Schools*, 611 F.2d 624, 639 (6th Cir.1979), *cert. denied*, 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980) (defining the term "attorney's fees" to include out-of-pocket expenses that are "'incidental and necessary expenses incurred in furnishing effective and competent representation' [and] those reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee-paying client, in the course of providing legal services.") (citations omitted).

ed in the latter category.[25] These include "those costs incurred by a party to be paid to a third party, not the attorney for the case, ... includ[ing], among others, docket fees, investigation expenses, deposition expenses, witness expenses, and the costs of charts and maps." *Northcross,* 611 F.2d at 639.

## A. Costs Incurred by Plaintiffs' Counsel

■ Plaintiffs claim reimbursement for two sets of expenses incurred in this litigation: costs their counsel incurred, and costs plaintiffs themselves incurred. Under the first heading, plaintiffs claim compensation for costs of deposition transcripts, subpoenas, photocopying, postage, complaint filing fee, long distance telephone calls, messenger service, and local transportation and parking that their counsel incurred litigating *Sexcius.*

### 1. Costs Traditionally Included in an "Attorney's Fee"

Reasonable photocopying, postage, long distance telephone, messenger, and transportation and parking costs are customarily considered part of a reasonable "attorney's fee."[26] If plaintiffs' request for these costs are sufficiently well-documented and reasonable, plaintiffs may recover these out-of-pocket expenses pursuant to the statutory authority of § 1988 to shift "attorney's fees."

Defendants have conceded that the amounts plaintiffs have claimed in photocopying, postage, and long distance telephone calls costs are "reasonable expenses." (Defs.' Opp'n, at 25.) However, defendants do challenge plaintiff's counsels' travel expenses and messenger service expenses as insufficiently documented. (Defs.' Opp'n, at 26.) Defendants are correct that plaintiffs' original request for messenger service costs was too high. However, in their reply mem-

orandum, plaintiffs eliminated all hourly messenger charges and requested compensation for only the remaining standard fees. (Reply Ex. 10.) These standard fee charges are well-documented and reasonable, and plaintiffs may recover them.

Similarly, in their application, plaintiffs claimed $123.60 for their counsels' local transportation and parking costs. After defendants challenged this amount as unsupported, plaintiffs cut from their request all but the well-documented costs, requesting only $108.50 in charges listed by date and amount. Plaintiffs may recover this reduced amount.

### 2. Costs Shifted by § 1920

■ The costs associated with deposition transcripts are clearly compensable under § 1920(4), if the costs are reasonable, the expenditures well-documented, and the depositions "necessarily obtained for use in the case." 28 U.S.C. § 1920(4). *See Robertson v. McCloskey,* 121 F.R.D. 131, 134 (D.D.C. 1988) ("costs associated with taking depositions" are taxed under § 1920(4) as transcripts "necessarily obtained").

Because defendants have conceded that plaintiffs' deposition transcript costs are "reasonable,"[27] and because the costs of the deposition transcripts are well-documented, plaintiffs may recover their claimed deposition costs. Plaintiffs may also recover their claimed filing fees.

### 3. Costs that Cannot be Shifted

Plaintiffs' subpoena costs may not be shifted to defendants. The cost of subpoenas is not a customary element of an attorney's fee,

---

25. *See West Virginia,* 499 U.S. at 86 & n. 3, 111 S.Ct. at 1141 & n. 3 (restating holding of *Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987), that § 1920 and other statutes "define the full extent of a federal court's power to shift litigation costs absent express statutory authority to go further.").

   Other statutes further define some of the terms of § 1920. For example, 28 U.S.C. § 1821(b) caps the per diem amount that may be taxed for

"witnesses" (including expert witnesses) under § 1920(3).

26. *See, e.g., Jenkins,* 491 U.S. at 285, 109 S.Ct. at 2470 (including the cost of secretaries and messengers in a reasonable attorney's fee); *Northcross,* 611 F.2d at 639 (including photocopying, travel, and telephone costs as customary elements of an attorney's fee).

27. Defs.'s Opp'n, at 25.

and it is clearly not taxed under § 1920.[28]

## B. Costs Incurred by Plaintiffs Themselves

Plaintiffs also seek compensation for a second category of costs: the costs incurred not by counsel, but by plaintiffs themselves. Plaintiffs themselves paid out-of-pocket for some of the photocopying and postage costs of their case, incurred some travel expenses going to and from litigation-related events, and lost a portion of their wages while litigating this case.

### 1. Costs of Photocopying, Postage, and Travel

■ In order to save money, plaintiffs' counsel recruited plaintiffs themselves to review and forward new documents to Ms. Weiss and to interview potential witnesses. In doing these tasks, plaintiffs incurred some photocopying and postage costs that their counsel could have incurred had counsel done the tasks in the first place. (Weiss Decl. (Application) at ¶ 14.)

Because reasonable photocopying and postage are customarily considered part of a reasonable "attorney's fee," plaintiffs' out-of-pocket expenses would clearly be compensable if their counsel had incurred them first and then billed these costs to plaintiffs. *See Northcross*, 611 F.2d at 639. Denying plaintiffs compensation for these costs would force clients in the future to insist on the senseless formality of having their counsel incur out-of-pocket costs first (perhaps at higher expense) and bill them afterwards. Plaintiffs' requests for reimbursement of photocopying and postage costs are well-documented, and defendants concede the amounts claimed are "reasonable." (Defs.' Opp'n, at 25.) Plaintiffs may recover their out-of-pocket photocopying and postage costs.

■ However, plaintiffs may not recover their travel expenses. In her declaration, Ms. Weiss states that plaintiffs also incurred "travel" costs in the course of reviewing and forwarding new documents to counsel and interviewing potential witnesses. (Weiss Decl. (Application) at ¶ 14). If this were true—if, for example, plaintiffs had incurred travel costs running about town doing the sort of work that their lawyers would have done if plaintiffs themselves had not—plaintiffs would have a plausible claim. They might have persuasively argued that they were simply incurring travel costs that their counsel would have billed to them anyway, had counsel performed the travel themselves.

However, the travel costs claimed by plaintiffs appear to be costs for which their counsel could never have billed them. Plaintiffs claim compensation for transportation and parking associated with court hearings and depositions, events that their counsel undoubtedly attended as well. (Pls.' Ex. 9 (Reply) at ¶ B.) In this instance, plaintiffs were clearly not incurring costs in their counsels' stead. Rather than seeking compensation for the type of costs routinely incurred by lawyers and billed to clients, plaintiffs are attempting to claim compensation for their personal costs. Thus plaintiffs may not recover their transportation and parking costs that they themselves incurred.

### 2. Lost Wages

■ Plaintiffs also claim compensation for the wages they lost taking leave to assist in the development and trial of this case. Ms. Sexcius missed several days of work on unpaid leave in order to prepare for court appearances, appear in court, confer with counsel and potential witnesses, and review and prepare court documents. (Sexcius Decl. (Application) at ¶ 1.) (Mr. Edmead appears to have taken time off work to make similar efforts to develop the case, but he has not submitted an affidavit stating that his work leave was unpaid.)

However, Congress has not authorized the courts to shift the expense of wages lost during the course of litigation. Lost wages are clearly not one of the elements of an "attorney's fee" shifted by § 1988. Elements of an attorney's fee must be, at a minimum, those costs that are incurred by the *attor-*

---

**28.** *See Zdunek v. Washington Metropolitan Area Transit Authority*, 100 F.R.D. 689, 692 (D.D.C. 1983) (cost of hiring special process servers to serve subpoenas not a taxable cost). *See also* 10 Wright & Miller, *Federal Practice and Procedure* § 2677, at 371–72 (1983).

*neys* (or that easily could have been incurred by the attorneys, *see supra* (III)(B)(1)) and then billed to the clients. Plaintiffs' loss of wages, by contrast, is an out-of-pocket loss that has nothing to do with attorneys' billing practices. Nor are lost wages one of the costs Congress has shifted under § 1920 or some other statute. Section 1920 makes no mention of lost wages in its list of taxable costs, and this court knows of no other statute that expressly shifts lost wages to the losing party.[29]

Because Congress has not empowered this court to shift the burden of lost wages under § 1988, § 1920, or other statute, this court cannot award plaintiffs the wages they lost during litigation. This conclusion conflicts with this Circuit's 1984 ruling that § 1988 shifts lost wages,[30] but it is faithful to the Supreme Court's 1991 ruling that unless an out-of-pocket expense is either a traditional element of a § 1988 "attorney's fee" award, or is expressly shifted by § 1920 or some other statute, federal courts lack power to shift the cost. In the present case, § 1988 and § 1920 "define the full extent of a federal court's power to shift litigation costs absent express statutory authority to go further."[31]

## IV. CONCLUSION

For litigating the merits of *Sexcius* and for litigating this fee petition, plaintiffs are awarded fees in accordance with the chart below:

| Attorney | Hours | Prevailing Market Rate | Amount |
|---|---|---|---|
| Ms. Weiss | | | |
| –Original request | 629.85 | $260 per hour | $163,761.00 |
| –Supplemental request | 22.85 | $260 per hour | $ 5,941.00 |
| Ms. Barnett | | | |
| –Original request | 249.35 | $260 per hour | $ 64,831.00 |
| –Supplemental request | 9.85 | $260 per hour | $ 2,561.00 |
| Law Students | 65.35 | $ 80 per hour | $ 5,228.00 |
| Total Fees for Merits and Fee Litigation | | | $242,322.00 |

For litigating the merits of *Sexcius* and for litigating this fee petition, plaintiffs are awarded costs in accordance with the chart below:

| Type | Amount |
|---|---|
| **Costs Incurred by Counsel** | |
| –Deposition transcripts | $1,372.10 |
| –Photocopying | $1,833.90[32] |
| –Postage | $ 180.44 |
| –Filing fee for complaint | $ 120.00 |

| Type | Amount |
|---|---|
| –Long distance telephone calls | $ 8.55 |
| –Messenger service | $ 490.20 |
| –Transportation and Parking | $ 108.50 |
| **Costs Incurred by Plaintiff Sexcius** | |
| –Photocopying | $1,167.14 |
| –Postage | $ 60.00 |
| **Costs Incurred by Plaintiff Edmead** | |
| –Photocopying | $ 967.14 |
| –Postage | $ 26.95 |
| Total Costs | $6,334.92 |

**29.** Of course, plaintiffs might have been able to claim the cost of their lost wages as part of their damages award. Plaintiffs did not do so in the present case.

**30.** *See Laffey,* 746 F.2d at 30 (holding that in enacting § 1988, Congress intended plaintiffs to recover wages lost during litigation). *See also Kyles v. Sec. of Agriculture,* 604 F.Supp. 426, 437 n. 21 (D.D.C.1985) (ruling that in an attorney's fee award, plaintiffs may recover "annual leave consumed ... in connection with [their] claim."); *Laffey,* 572 F.Supp. at 386 n. 73.

**31.** *West Virginia,* 499 U.S. at 86, 111 S.Ct. at 1141.

**32.** In their application, plaintiffs requested this amount for photocopying and requested $180.44 for postage. Defendants in their opposition do not contest these amounts. In their reply brief, plaintiffs requested a higher amount for both photocopying and postage, without explanation or documentation. Only the lower, uncontested amounts will be awarded.

In sum, plaintiffs are awarded attorney's fees and costs as follows:

| | |
|---|---|
| Total Fees for Merits and Fee Litigation | $242,322.00 |
| Costs | $ 6,334.92 |
| (Less amount paid for contempt) | ($ 847.05) |
| Total Fees and Costs | $247,809.87 |

Plaintiffs are hereby awarded $247,809.87 in attorney's fees and costs.

## ORDER

This matter comes before this court on plaintiffs' motion for an award of attorney's fees and costs under 42 U.S.C. § 1988, the Civil Rights Attorney's Fee Awards Act of 1976. Upon consideration of the record herein, it is hereby, for the reasons set forth in an accompanying memorandum opinion,

ORDERED that plaintiffs' motion for an award of attorney's fees and costs is granted, and it is further

ORDERED that defendants shall, within forty-five days of the date of this order, pay plaintiffs attorney's fees and costs in the amount of $247,809.87.

SO ORDERED.